1
2
3
4
5
6
7
8
9
10
11
12
13
14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT G. PULLEY,<br><br>                              Petitioner,<br><br>v.<br><br>D. PARAMO, Warden, et al.,<br><br>                              Respondents. | Case No.: 14-cv-2034-JLS-MDD<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE: PETITION FOR WRIT OF HABEAS CORPUS** |

## I.  INTRODUCTION

15
16
17
18
19

        This Report and Recommendation is submitted to United States District Judge Janis L. Sammartino pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(c) of the United States District Court for the Southern District of California.

20
21
22
23
24
25

        After reviewing the Petition (ECF No. 1), Respondents' Answer and Memorandum of Points and Authorities in support thereof ("Answer") (ECF Nos. 10, 10-2), Petitioner's Traverse (ECF Nos. 26), supporting documents and pertinent state court Lodgments (ECF No. 11), the Court **RECOMMENDS** the Petition be **DENIED** for the reasons stated below.

## II.  PROCEDURAL HISTORY

### A.  Federal Proceedings

On August 29, 2014, Robert G. Pulley ("Petitioner"), a state prisoner proceeding pro se, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  (ECF No. 1).  The Petition contains two grounds for relief, both challenging his second degree murder conviction.  (ECF No. 1 at 6-7, 31-44[1]).  Petitioner also was convicted of felony criminal threat and misdemeanor battery, but he does not challenge those convictions.  (*Id*.).

First, Petitioner contends that his Fourteenth Amendment due process rights were violated because there was insufficient evidence to overcome the presumption under Penal Code § 187(a) that he was acting in self-defense in his home when he killed his neighbor in the garage attached to Petitioner's house.  (*Id*. at 6, 31-41).

Second, Petitioner contends that his due process rights were violated because there was no evidence of malice requiring that his conviction be reduced from murder to manslaughter.  (*Id*. at 7, 41-44).

On November 6, 2014, Respondents filed an Answer, memorandum in support thereof and lodgments.  (ECF Nos. 10, 11).  Petitioner constructively filed his traverse on January 15, 2015.  (ECF No. 26).

Petitioner also filed a motion for stay and motion to amend his Petition, which motions were denied on September 1, 2015, by District

---

[1] All page references are to the CM/ECF pagination, rather than the pagination native to the document.

2

Judge Sammartino in an Order adopting this Court's Report and Recommendation.  (ECF No. 47).

### B.  State Proceedings

On December 25, 2010, Petitioner shot and killed his neighbor Jimmy Misaalefua during a brawl while they were in the garage attached to Petitioner's house.  (ECF Nos. 1, 11-22 (Lodg. 5) at 7).  Earlier the same night, Petitioner had threatened and hit his son Matthew Pulley during a fight.  (*Id*. at 4-5).

Over a month earlier, on November 11, 2010, Petitioner's wife had called 911 to prevent him from driving while drunk.  (*Id*. at 2-3).  Believing she was bluffing, Petitioner shouted he had a gun and was going to kill himself and his wife.  (*Id*.).  Officers responded, but no arrest was made or charges brought at the time because Mrs. Pulley was not in fear for her safety.  (*Id*.).

On May 3, 2011, the San Diego County District Attorney filed an information charging Petitioner with one count of murder (count 1: Cal. Pen. Code § 187(a)), two counts of criminal threats (counts 2 and 4: Cal. Penal Code § 422), and one count of misdemeanor battery (count 3: Cal. Pen. Code § 242).  (ECF No. 11-22 (Lodg. 5) at 11).  With respect to the murder charge, the information alleged that Petitioner intentionally and personally discharged a firearm resulting in death (§ 12022.53(d)) and personally used a firearm (§12022.5(a)).  *Id.*

A jury found Petitioner guilty of second degree murder of Jimmy Misaalefua (count 1), battery of Matthew Pulley (count 3), and one count of making a criminal threat directed at Matthew Pulley (count 2).

3

1   (ECF No. 11-22 (Lodg. 5) at 11).  The jury also found true the firearm

2   allegations charged in connection with count 1.  (*Id*.).  The jury found

3   Petitioner not guilty of one count of making a criminal threat directed

4   at Mrs. Pulley (count 4).  (*Id*.).  The court sentenced Petitioner to 40

5   years to life in prison.  (*Id*.).

6       Petitioner appealed his conviction.  On June 6, 2012, Petitioner

7   filed his opening brief, alleging that his due process rights were violated

8   because: (1) there was insufficient evidence to find Petitioner guilty of

9   murder; (2) the prosecution did not sustain its burden to prove that

10   Petitioner acted with malice; and (3) the trial court erred by not

11   severing count 4 for criminal threat against Petitioner's wife from the

12   other three counts.  (ECF No. 11-20 (Lodg. No. 3) at 3-4).  On November

13   1, 2012, the People filed its brief arguing the trial court's judgment was

14   without error.  (ECF No. 11-21 (Lodg. No. 4)).

15       On March 22, 2013, the California Court of Appeal denied

16   Petitioner's direct appeal and affirmed the trial court's judgment.  (ECF

17   No. 11-22 (Lodg. 5)).

18       On March 28, 2013, Petitioner filed a petition for review in the

19   California Supreme Court raising the insufficiency of evidence and

20   failure to prove malice grounds concerning the murder conviction, but

21   not raising the third ground concerning severance of count 4.  (ECF No.

22   11-23 (Lodg. No. 6)).  On June 13, 2013, the California Supreme Court

23   summarily denied Petitioner's petition for review.  (ECF No. 11-24

24   (Lodg. No. 7)).

25

4

1

## III.  STATEMENT OF FACTS

2     "[A] determination of a factual issue made by a State court shall

3 be presumed to be correct."  28 U.S.C. § 2254(e)(1).  Petitioner has the

4 "burden of rebutting the presumption of correctness by clear and

5 convincing evidence."  *Id.*; *see Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th

6 Cir. 1997) (overruled on other grounds by *Lindh v. Murphy*, 521 U.S.

7 320 (1997) (stating that federal courts are required to "give great

8 deference to the state court's factual findings.")).  Accordingly, the

9 following facts are taken from the California Court of Appeal's opinion[2]:

10

> 2.   *The December 25, 2010 battery and threat (counts*
11 >        *2 and 3)*

12
>        At approximately 12:30 a.m on December 25, 2010,
13 > Sergeant Regalado responded to a noise complaint call from
> the 3900-block of Brown Street in Oceanside.  The only
14 > house that appeared to have anything going on was that of
> the Misaalefua family, who lived across the street from
15 > Pulley's house.  The garage door at the Misaalefua residence
> was up, and there were fewer than a dozen people in the
16 > garage.  Regalado spoke with Jimmy Misaalefua, the host of
> the party, told him about the noise complaint, and talked
17 > with him about ways that the group could be quieter.
> Misaalefua was cooperative and apologetic.  After talking
18 > with Misaalefua, Regalado left.
19
20 >        At 1:53 a.m., Regalado returned to Brown Street in
> response to a call for police assistance called in by
21 > paramedics who had arrived in response to what had

22

23

---

24 [2] Facts that are immaterial to Petitioner's challenges to the murder conviction
(count 1) are omitted.  Some facts concerning the unchallenged criminal threat and
25 battery convictions (counts 2 and 3) are included for context or because they are also
material to the murder conviction.

14-cv-2034-JLS-MDD

originally been a call for medical assistance.  An earlier call from Pulley's son, Matthew, stating that a woman had fallen and needed medical assistance had resulted in a paramedic and fire response.  When Regalado arrived, he saw four firefighters restraining Pulley, who was on the ground in front of his residence.  The firefighters explained that when they arrived in response to the medical call, Pulley told them that he had a shotgun in the house.  The firefighters asked Pulley not to go inside until they administered medical aid, but Pulley ignored them and started to go into the house.  At that point, the firefighters felt that it was necessary to restrain Pulley.

Regalado and other officers completed a safety sweep of the residence.  They found Angela [Pulley's wife and Matthew's mother] upstairs, in bed, covered with blankets. Officers called out to her but got no response.  They then tapped on her shoulder and were able to awaken her. Angela acted as if she had been unaware that the police were there, and told the officers that she was fine and did not need any help.

Matthew explained that he and Pulley had gotten into a fistfight earlier that evening.  Matthew did not want to authorize an arrest of Pulley, but he did not want to go back into his house.  Officers gave Matthew a ride to a nearby restaurant, and Pulley was released at his residence.

At trial, Matthew testified that his mother had fallen while trying to break up a physical altercation between Matthew and his father.  Matthew called the fire department to check on his mother and make sure she was not hurt.  According to Matthew, the fight between him and his father had started when Matthew and his father were talking about the Marines and the Army, and Pulley "felt disrespected."  During the altercation, Pulley poured a drink on Matthew, and Matthew went outside to cool off.  When

6

Pulley went outside to apologize, Matthew threw Pulley into the pool. Matthew then went inside and began teasing Pulley. Pulley hit Matthew in the fact, knocking him down. Matthew then went outside and challenged Pulley to a fight. When Pulley walked outside to meet Matthew, Matthew grabbed a golf club and started antagonizing Pulley. At this point, Pulley started to walk back into the house, and said that he needed to get away before he shot, stabbed, or killed Matthew. Matthew told the police that Pulley had made direct threats, saying "I'm gonna kill him, I'm gonna shoot him and stab him." Matthew said that he knew that Pulley was capable of carrying out the threats.

### 3. *The December 25, 2010 murder (count 1)*
#### a. *Other witness evidence*

Dexter Ena, Misaalefua's nephew, was at Misaalefua's house on Christmas Eve for a family gathering. Ena saw Pulley walking toward Misaalefua's house and asked Misaalefua who Pulley was. Misaalefua responded that Pulley was a neighbor. Ena walked to the back of the garage to get a beer from a refrigerator. When he returned, he saw Pulley and Misaalefua walking toward the street. Misaalefua had his arm around Pulley and it appeared that they were talking in a friendly manner.

Ena walked toward the street. When he got to the end of the driveway, he saw Pulley fall to the ground. Misaalefua was standing over Pulley, and Ena assumed that they were fighting. Ena ran to where Misaalefua was standing and asked what was going on. Misaalefua told Ena to "leave it alone." Another of Ena's uncle's, Matt Young, ran over to try to separate Misaalefua and Pulley.

Pulley got up from the street and said to Misaalefua, "I thought we were friends." Pulley then assumed a fighting stance. Young tried to push Misaalefua back, and Ena

7

grabbed Pulley and told him to calm down.  Once Misaalefua and Pulley were separated, Ena let go of Pulley.  Pulley started walking back to his house.  As he was walking toward the house, he looked back at Misaalefua and said, "I got something for you.  I got something for you, mother fucker."  Misaalefua yelled back something like, "All right, mother fucker.  Let's go.  Bring it on."

As Pulley walked toward his house, Misaalefua followed him.  Ena attempted to stop Misaalefua, telling him to leave it alone and to let Pulley go.  Misaalefua told Ena to "shut up" and continued following Pulley, who had gone into his garage and then into his house.  When Misaalefua walked into Pulley's garage, Ena, who had been following, stopped just outside the garage.  Misaalefua took off his shirt and Ena assumed that he was preparing to fight.  Misaalefua waited approximately five to 15 feet outside the inner garage door.

Ena and Young tried to convince Misaalefua to return to his house with them.  Ena then heard Misaalefua say, "What are you going to do with that?  Shoot me[?]"  Immediately after Misaalefua said that, Ena heard a gunshot.  After the gunshot, Misaalefua said, "Is that all you got?  Is that all you got?"  Pulley and Misaalefua then started wrestling, and Ena heard more shots. [n.3 Although Ena's testimony was that there were "more gunshots," it seems clear from the evidence that Pulley fired a total of two times.]

Ena moved through the garage and tried to shield himself behind a car.  Young ran up to the left side of a car that was parked in the garage.  Misaalefua was fighting with Pulley over the gun.  Young reached the two men before Ena could.  When Young got to the men, they all fell down.  Young yelled at Pulley to let go of the gun.

8

14-cv-2034-JLS-MDD

Pulley was on top of Misaalefua when Ena got to them, and Young was on top of Pulley, trying to get the gun. Misaalefua said, "Get this mother fucker off of me." Ena told Pulley to let go of the gun, and tried to pull the gun away from Pulley. As Ena tried to get the gun away, Pulley bit Ena, and Ena hit Pulley. At that point, Young and Pulley both partially fell off of Misaalefua. Ena told Misaalefua, "Let's move, let's go." Misaalefua just kept repeating, "Get this guy off of me, get this mother fucker off of me." As Misaalefua spoke, his voice started to fade. Ena kept trying to hit Pulley to make him to let go of the gun. This continued until the police arrived.

Sao Young, Misaalefua's sister-in-law, called 911 at 2:43 a.m., which was only 13 minutes after Sergeant Regalado had cleared the earlier call involving Pulley and his son. Sao young reported that someone had been shot, and that her husband, Matt Young, was wrestling with someone who was holding a gun.

Sergeant Regalado returned to Brown Street in response to a call about shots being fired. When Regalado arrived, he saw several people engaged in a struggle inside Pulley's garage. Misaalefua was on the ground with his eyes closed. A pool of blood was forming around him. Two women were standing over Misaalefua, crying and grabbing at him. Two men were struggling to restrain Pulley.

Regalado grabbed Pulley's right arm and Pulley released a small semi-automatic handgun. As Regalado tried to hold onto Pulley's arm, Pulley stiffened in a manner that made Regalado think that Pulley was trying to grab the gun. Regalado held Pulley's arm tighter, picked up the gun, and moved it beyond Pulley's reach. Regalado then handcuffed Pulley with the assistance of other officers.

14-cv-2034-JLS-MDD

Misaalefua subsequently died at the hospital as a result of a gunshot wound to the chest.

b. *Pulley's December 25 interview*

Detective William Wallace interviewed Pulley on December 25, 2010. A video of the interview was played for the jury at trial. During the interview, Pulley told Wallace that when officers arrived at his home the first time on December 25, he was thrown to the ground, put in handcuffs, and placed in a patrol car for approximately 30 minutes. Pulley said that at the time he did not know why this was happening. When the police finally left, he walked over to Misaalefua's house to apologize for the disturbance. According to Pulley, as he started to apologize to Misaalefua, Misaalefua hit him and knocked him to the ground. Pulley got up, asked Misaalefua what was wrong with him, and then ran back to his house because Misaalefua was "just going crazy." Pulley ran to the front door, went inside the house and grabbed his gun. He ran around to the garage to close the garage door, but someone was standing near the door and it would not close. Pulley ran outside and said, "Get the hell of my property," or something to that effect. He explained to Wallace that after that point, he did not remember what happened, other than that he had been tackled.

Pulley told Wallace that he kept his .25-caliber pistol in a china cabinet by the front door in case of a home invasion. He owned a number of guns and kept another gun by his bed. Pulley explained that he grabbed the gun from the china cabinet on his way to close the garage door. Pulley said that he did not remember the gun going off, and also did not remember taking the safety off of the gun to prepare to use it. Pulley admitted that he had had "lots of weapons training" from his military experience, and said that he did

10

not normally take the safety off of a gun when he grabbed one.

Pulley told Wallace that he had been drinking vodka that night.

c. *Other evidence*

The parties stipulated that Pulley's blood alcohol level at the time of the shooting was approximately .19 percent. Misaalefua's blood alcohol level at the time of his death was .18 percent.

A criminalist with the San Diego County Sheriff's Department Crime Laboratory analyzed the Browning .25-caliber pistol and two expended cartridge cases. The pistol was working properly. It required six pounds of pressure to pull the trigger. The pistol had a magazine safety mechanism, which meant that it would not fire if there was no magazine in the weapon. The gun also had a manual safety.

The criminalist determined that the muzzle of the gun had been less than six inches from Misaalefua at the time it was fired.

A firearm expert testified that the pistol used in the shooting required a six-pound trigger pull, and that this was on the heavy side for a .25-caliber automatic pistol. In order to activate the safety of the .25 Browning pistol, a person must execute a very deliberate action, which makes it a relatively safe weapon.

(ECF No. 11-22 (Lodg. No. 5 at 4-10)).

11

# IV.  STANDARD OF REVIEW

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh*, 521 U.S. 320.  Title 28, U.S.C. § 2254(a) provides the scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the grounds that he is in custody in violation of the Constitution or laws or treaties of the United States.

Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.  28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).

Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions . . . ." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  A state court's decision may be "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." *Id.* at 406-06.  A state court decision does not have to demonstrate an

12

awareness of clearly established Supreme Court precedent, provided neither the reasoning nor the result of the state court decision contradict such precedent. *Early*, 537 U.S. at 8.

A state court decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407. An unreasonable application may also be found "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.*; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003); *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003).

Relief under the "unreasonable application" clause of § 2254(d) is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 134 S.Ct. 1697, 1706-07 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86). An unreasonable application of federal law requires the state court decision to be more than incorrect or erroneous. *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003). Instead, the state court's application must be "objectively unreasonable." *Id.*; *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Even if a petitioner can satisfy § 2254(d), the petitioner must still demonstrate a constitutional violation. *Fry v. Pliler*, 551 U.S. 112, 119-22 (2007).

14-cv-2034-JLS-MDD

Federal courts review the last reasoned decision from the state courts. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991); *Hibbler v. Benedetti*, 693 F.3d 1140, 1145–46 (9th Cir. 2012). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004). The petitioner must establish that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement. . . ." *Burt v. Titlow*, 134 S. Ct. 10, 16 (2013) (citation omitted). It is not within a federal habeas court's province "to reexamine state court determinations on state-law questions. . . ." *Hayes v. Ayers*, 632 F.3d 500, 517 (9th Cir. 2011) (citation omitted).

# V. DISCUSSION

## A. Claim 1: Self-Defense in Home

Petitioner argues there is insufficient evidence to override the presumption that his killing of Misaalefua was justified by his reasonable fear that the victim intended to physically harm him in his home.

### 1. State Court Opinion

Petitioner presented this claim in his habeas petition to the state appellate and supreme courts on direct review. (ECF Nos. 11-20, 11-23 (Lodg. Nos. 3, 6)). The appellate court denied Petitioner's claim on the

14

merits. (ECF No. 11-22 (Lodg. No. 5)). The California Court of Appeal rejected Petitioner's contention that there is insufficient evidence for the jury to have determined that Petitioner's killing of Misaalefua was not legally justified. (ECF No. 11-22 (Lodg. No. 5) at 12-17). The California Supreme Court summarily denied the petition without a statement of reasoning or citation to authority. (ECF No. 11-24 (Lodg. No. 7)). Accordingly, this Court must "look through" to the state appellate court's opinion denying the claim as the basis for its authority. *Ylst*, 501 U.S. at 805-806. That court wrote:

> Pulley first contends that the evidence is insufficient to support his conviction for second degree murder because, he asserts, the only reasonable conclusion that a fact finder could reach from the evidence presented at trial is that he acted with legal justification in defending himself within his home. Pulley's argument is, in essence, that the evidence established justified self-defense as a matter of law. We disagree with Pulley's contention that the only reasonable inference from the evidence is that he had legal justification to kill Misaalefua.

> When the sufficiency of the evidence is challenged, the court is not required to " ' "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." [Citation.] Instead the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]" (*People v. Johnson* (1980) 26 Cal.3d 557, 576; *see also Jackson v. Virginia* (1979) 443 U.S. 307, 319.)

> "In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable

14-cv-2034-JLS-MDD

doubt, the appellate court 'must … presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citations.] The court does not, however, limit its review to the evidence favorable to the respondent…. '[O]ur task … is twofold.  First, we must resolve the issue in the light of the *whole record*—i.e., the entire picture of the defendant put before the jury—and may not limit our appraisal to isolated bits of evidence selected by the respondent.  Second, we must judge whether the evidence of each of the essential elements … is *substantial*; it is not enough for the respondent simply to point to "some" evidence supporting the finding, for "[n]ot every surface conflict of evidence remains substantial in light of other facts." ' [Citation.]" (*People v. Johnson*, *supra*, 26 Cal.3d at pp. 576-577, *quoting People v. Bassett* (1968) 69 Cal.2d 122, 138.)

   Pulley relies on the presumption created by section 198.5 as support for his argument that his conduct in killing Misaalefua was legally justified.  Section 198.5 provides:

   "Any person using force intended or likely to cause death or great bodily injury within his or her residence shall be presumed to have held a reasonable fear of imminent peril of death or great bodily injury to self, family or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred.

   "As used in this section, great bodily injury means a significant or substantial physical injury."

16

14-cv-2034-JLS-MDD

Section 198.5 was created "to permit residential occupants to defend themselves from intruders without fear of legal repercussions, to give 'the benefit of the doubt in such cases to the residence....' [Citation.]" (*People v. Owen* (1991) 226 Cal.App.3d 996, 1005).

Pulley argues that it was incumbent on the prosecution to prove beyond a reasonable doubt that Pulley's conduct in shooting Misaalefua was without legal justification, and that there is insufficient evidence for the jury to have determined that he acted without that legal justification. A review of the record establishes that there is sufficient evidence that Pulley's conduct was not legally justified under section 198.5.

Pulley acknowledges that the jury was properly instructed concerning self-defense, voluntary manslaughter, and defense of home or property. With respect to defense of home and property, the jury was instructed with CALCRIM No. 506, as follows:

"The defendant is not guilty of murder or manslaughter if he killed to defend himself or any other person in the defendant's home. Such a killing is justified, and therefore not unlawful, if:

"1. The defendant reasonably believed that he was defending a home against Jimmy [Misaalefua], who violently or riotously or tumultuously tried to enter that home intending to commit an act of violence against someone inside;

"2. The defendant reasonably believed that the danger was imminent;

17

"3. The defendant reasonably believed that the use of deadly force was necessary to defend against the danger; AND

"4. The defendant used no more force than was reasonably necessary to defend against the danger.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of violence to himself or someone else.  Defendant's belief must have been reasonable and he must have acted only because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation.  If the defendant used more force than was reasonable, then the killing was not justified.

"When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed.  If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

"A defendant is not required to retreat.  He is entitled to stand his ground and defend himself and, if reasonably necessary, to pursue an assailant until the danger of death/bodily injury has passed. This is so even if safety could have been achieved by retreating.

"The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must

18

14-cv-2034-JLS-MDD

find the defendant not guilty of murder or manslaughter."

We presume that the jury understood and followed this jury instruction (see *People v. McKinnon* (2011) 52 Cal.4th 610, 670), and thus we further presume that the jury properly considered whether the people met their burden of proving that Pulley was not justified in killing Misaalefua. There is sufficient evidence to support a conclusion that the killing of Misaalefua was not justified. In particular, there is sufficient evidence to support a conclusion that Pulley used more force than was reasonable in shooting Misaalefua.

Pulley and Misaalefua got into a physical altercation after Pulley walked over to Misaalefua's house on the night in question. The evidence demonstrates that Pulley fell to the ground, either because he stumbled or because he was knocked down by Misaalefua, as the two were walking together toward Pulley's house. At that point, Pulley started to threaten Misaalefua, saying, "I got something for you. I got something for you, mother fucker." This clearly took place before either man arrived at Pulley's house. After these events, both men continued toward Pulley's home. Pulley entered the house through an interior garage door, while Misaalefua stood in the garage, between five and 15 feet away from that interior door, waiting for Pulley to return. The jury could have reasonably inferred that Misaalefua was not attempting to enter Pulley's home, and that Pulley could have avoided the entire incident if he had simply remained in his house.

Instead, Pulley grabbed a firearm from inside his house and went back out to the garage where Misaalefua was standing. When Misaalefua saw the gun he said, " 'What are you going to do with that[?] Shoot me[?]' " Without any further physical threat from Misaalefua, Pulley fired a shot

19

at Misaalefua.  Only then did the two men begin to physically wrestle, and Pulley fired another shot.

It is clear from these facts that Pulley increased the violence in this altercation by, as the prosecutor argued, bringing a gun to what was, essentially, a fistfight.  Further, because Misaalefua did not attempt to follow Pulley into Pulley's house, the jury could have reasonably concluded that the fight had essentially ended when Pulley walked inside the house and closed the door.  Instead of locking the door or calling the police, Pulley grabbed a gun and walked back out to the garage and did what he had earlier essentially threatened to do, i.e., he gave "something" to Misaalefua.  The jury could have concluded that in retrieving a gun and shooting an unarmed man, Pulley used more force than was reasonably necessary to protect himself or his house, and thus, that the presumption of justification embodied in section 198.5 had been overcome by contrary evidence.

Given the state of the evidence, we must uphold the jury's conclusion that Pulley was not justified in killing Misaalefua.  Although, as Pulley has argued on appeal, a jury might have concluded that his conduct was justified, as long as the circumstances reasonably justify the jury's findings, we will not reverse the jury's verdict simply because the evidence might support a contrary conclusion. (*People v. Sassounian* (1986) 182 Cal.App.3d 361, 408.)  The circumstances more than reasonably support the jury's rejection of the justification defense in this case.

(ECF No. 10-2 at 10-13).

## 2. Summary of Arguments
### a.   Petitioner's Arguments

Petitioner argues that the court of appeal's decision finding sufficient evidence to support the murder conviction was based on false

14-cv-2034-JLS-MDD

evidence presented by the prosecution and based on an unreasonable determination of the facts.  (ECF No. 1 at 6, 31-41).  Specifically, Petitioner argues that there is insufficient evidence to overcome the Penal Code § 198.5 statutory presumption that Petitioner's conduct was legally justified because the victim unlawfully entered his residence. (*Id.*).  Petitioner relies on a passage in *Beard v. U.S.*, 158 U.S. 550 (1895) that states:

> The court seems to think, if the deceased had advanced upon the accused while the latter was in his dwelling house, and under such circumstances as indicated the intention of the former to take the life or inflict great bodily injury, and if, without retreating, the accused had taken the life of his assailant, having at the time reasonable grounds to believe, and in good faith believing that his own life would, or great bodily harm done him unless he killed the accused the case would have been on of justifiable homicide.

*Id.* at 559.  Petitioner also relies on state court opinions for the proposition that entry into an attached garage or a garage sharing "the same roof" as house and carport by an intruder constitutes first degree burglary.  (ECF No. 1 at 39).

Petitioner argues that the § 198.5 presumption was triggered as a matter of law when the victim pursued Petitioner into his attached garage, because the attached garage was part of Petitioner's home as a matter of state law, and the victim, having already assaulted the Petitioner without provocation, entered Petitioner's home with the intention to commit a felony (*e.g.*, battery).  Accordingly, Petitioner argues, he was not obligated to retreat from defending his home against

21

1   the advancing intruder.  Petitioner further argues he was legally

2   justified in shooting Misaalefua, because Misaalefua did not retreat and

3   continued to provoke Petitioner when he returned to the garage with

4   the gun, and because Misaalefua did not retreat and said "Is that all

5   you got? Is that all you got?" even after Petitioner fired the first shot.

6       Petitioner contends that the court of appeals unreasonably applied

7   the facts when it "found the jury could have reasonably inferred that

8   Misaalefua 'was not attempting to enter petitioner's home,'" because

9   Misaalefua was "[a]lready inside" Petitioner's home once he entered the

10  attached garage.  (ECF No. 1 at 39).  Similarly, Petitioner argues the

11  court of appeals unreasonably applied the facts in finding "that

12  petitioner could have 'avoided the entire incident if he had simply

13  remained inside his house" and ignore[d] the fact that petitioner had to

14  go into the garage to close [*sic*] door to further secure his residence ...."

15  (*Id*.).  Petitioner concludes that there is no evidence to support any

16  conclusion in this case other than that Petitioner was in his own home

17  acting to protect himself from an intruder who intended to physically

18  harm him.  (*Id*. at 39-40).

19          **b.    Respondents' Arguments**

20      Respondents argue that the state court's rejection of Petitioner's

21  claim was reasonable and not contrary to controlling Supreme Court

22  authority.  (ECF No. 10-2 at 9-14).  In support, Respondents set forth

23  the applicable legal standard, a lengthy excerpt of the state appellate

24  court's opinion and a threadbare analysis.  Respondents made no

25  attempt to address whether the state court's opinion was contrary to

*Beard* or whether the opinion is based on the facts Petitioner finds objectionable.

### 3. Legal Standard

"In reviewing a criminal conviction challenged as lacking evidentiary support, the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence – that is, evidence which is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." *People v. Halvorsen*, 42 Cal. 4th 379, 419 (2007) (quoting *People v. Combs*, 34 Cal. 4th 821, 849 (2004), and citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see Gonzales*, 52 Cal. 4th at 294. The court is to presume, in support of the judgment, the existence of every fact the trier could reasonably deduce from the evidence – including both direct and circumstantial evidence. *People v. Prince*, 40 Cal. 4th 1179, 1251 (2007) (quoting *People v. Catlin*, 26 Cal. 4th 81, 139 (2001)).

United States Supreme Court precedent is essentially the same. Under clearly established federal law, "the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 318. In federal habeas proceedings, the magistrate judge must conduct an independent review of the state court record to evaluate the merits of a sufficiency-of-the-evidence challenge. *See Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997).

14-cv-2034-JLS-MDD

The question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319; *see Johnson v. Louisiana*, 406 U.S. 356, 362 (1972). "Although it might have been possible to draw a different inference from the evidence, [a federal habeas court is] required to resolve that conflict in favor of the prosecution." *Ngo v. Giurbino*, 651 F.3d 1112, 1115 (9th Cir. 2011).

Federal habeas courts also must analyze *Jackson* claims "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Chein v. Shumsky*, 373 F.3d 978, 983 (9th Cir. 2004) (en banc) (quoting *Jackson*, 443 U.S. at 324 n.16). Under California law, the elements of second degree murder are (1) the killing of another human being (2) without justification and (3) with "malice aforethought." Cal. Penal Code § 187(a). There is no dispute that Petitioner killed another human being, however Petitioner contends the second and third elements are not met in that the killing was legally justified and without malice.

Petitioner argues that the killing was legally justified under California Penal Code § 198.5. This section provides,

> Any person using force intended or likely to cause death
> or great bodily injury within his or her residence shall
> be presumed to have held a reasonable fear of imminent
> peril of death or great bodily injury to self, family, or a
> member of the household when that force is used
> against another person, not a member of the family or
> household, who unlawfully and forcibly enters or has

24

> unlawfully and forcibly entered the residence and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred.
>
> As used in this section, great bodily injury means a significant or substantial physical injury.

Section 198.5 was created "to permit residential occupants to defend themselves from intruders without fear of legal repercussions, to give the benefit of the doubt in such cases to the resident, establishing a [rebuttable] presumption that the very act of forcible entry entails a threat to the life and limb of the homeowner." *People* v. *Owen*, 226 Cal. App. 3d 996, 1005 (1991) (citation omitted). If Petitioner can show that the jury's finding that the prosecution overcame the presumption is not supported by sufficient evidence, his murder conviction must be reversed.

### 4. Analysis

Viewing the evidence in the light most favorable to the prosecution shows a rational trier of fact could have found the evidence against Petitioner was sufficient to prove beyond a reasonable doubt that Petitioner was not legally justified in using deadly force against the victim, even though the killing occurred in Petitioner's home. The facts show that Petitioner—after drinking to excess and brawling with his son and first responders—approached his neighbor, who was also drunk, and that Petitioner fell—either because he stumbled or because the neighbor pushed him. The two men tried to fight each other but were held back by the neighbor's brother-in-law and nephew. Feeling

14-cv-2034-JLS-MDD

outmatched in size and number, Petitioner walked back to his home while goading on the neighbor by saying "I've something for you, motherfucker." Petitioner went inside his house while the neighbor entered the garage attached to the house and waited for Petitioner at the door between the garage and the laundry room. Petitioner immediately got the loaded gun that he kept by the front door, took the safety off the gun, opened the door between the house and the garage, and shot the neighbor in the chest at close range, either immediately or after a brief scuffle.

### a.   Appellate Court Opinion Not Contrary to Federal Law

The state court objectively and reasonably concluded that substantial evidence supports the conclusion the jury reached (that the presumption was overcome because Petitioner used more force than reasonable), regardless of the possibility that a jury could have reached the conclusion Petitioner urges (that the killing was legally justified). (ECF No. 11-22 (Lodg. 5) at 16 ("Although, as Pulley has argued on appeal, a jury might have concluded that his conduct was justified, as long as the circumstances reasonably justify the jury's findings, we will not reverse the jury's verdict simply because the evidence might support a contrary conclusion.")).

The state court objectively and reasonably applied the very deferential state court standard of review, which is similar to the federal standard. Federal law mandates that a reviewing court "faced with a record of historical facts that supports conflicting inferences

1  must presume—even if it does not affirmatively appear in the record—

2  that the trier of fact resolved any such conflicts in favor of the

3  prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at

4  326. Applying the state's similar deferential standard, the appellate

5  court set aside its own beliefs, resolved all conflicting inferences in favor

6  of the prosecution, and concluded that a rational trier of fact could have

7  found beyond a reasonable doubt that Petitioner used more force than

8  was reasonable to defend against the danger presented by Jimmy

9  Misaalefua. This Court reaches the same conclusion, and recommends

10  finding the state court's determination is not contrary to federal law.

11      The appellate court's decision is also not contrary to the U.S.

12  Supreme Court case Petitioner relies upon. *Beard*, 158 U.S. 550. A

13  state court's decision may be "contrary to" clearly established Supreme

14  Court precedent "if the state court applies a rule that contradicts the

15  governing law set forth in [the Court's] cases" or "if the state court

16  confronts a set of facts that are materially indistinguishable from a

17  decision of [the] Court and nevertheless arrives at a result different

18  from [the Court's] precedent." *Williams*, 529 U.S. at 406. The *Beard*

19  case is distinguishable from this case in two material respects.

20      First, the procedural posture is different. *Beard* was convicted of

21  manslaughter in federal district court rather than state court, because

22  the offense occurred on federal land "in the Indian country." *Beard*, 158

23  U.S. at 551. Accordingly, *Beard* is inapposite because the Supreme

24  Court was sitting in direct review of the federal conviction, rather than

25  conducting a habeas corpus review of a state court opinion.

27

Second, the circumstances of the killings differ in material ways. In *Beard*, the victim "had threatened to kill the defendant, in execution of that purpose had armed himself with a deadly weapon, with that weapon concealed upon his person went on to the defendant's premises, despite the warning of the latter to keep away,…" and "the deceased advanced upon [the defendant] in a threatening manner, and with a deadly weapon,…" and "the accused did not provoke the assault." *Id*. at 563-564. For that matter, "[t]here was not the slightest foundation in the evidence for the intimation that Beard had used provoking language, or resorted to any device, in order to have a pretext to take the life of either of the brothers." *Id*. at 559. Although Beard, who had a gun, was protecting himself and his wife against three men with guns, he did not shoot at the aggressors. Instead, he used the gun to hit each one of them on the head, because he was trying to avoid lethal force. The blow to the head proved fatal to one of the men.

In contrast, Misaalefua had not threatened to kill Petitioner before their altercation, had not armed himself with a deadly weapon, and Petitioner had goaded the victim saying "I got something for you, mother fucker." Given these material factual differences, it would have been unreasonable for the appellate court to have extended *Beard*'s holding to this case.

Moreover, even if *Beard* applied to this case, the appellate court's decision is not contrary to *Beard*. *Beard* held that a person is not required to retreat when acting in defense of self in a place, such as a home or surrounding property, where the person has a right to be. *Id*.

28

at 563-564.  In so holding, the Court carved out the exception that the defendant's self-defense killing is only legally justified if he acts "in such way and with such force as, under all the circumstances, he at the moment, honestly believed, and had reasonable grounds to believe, were necessary to save his own life, or to protect himself from great bodily injury."  The Supreme Court later explained that although the failure to retreat is not "categorical proof of guilt," (*i.e.*, there is no duty to retreat), it is "a circumstance to be considered with all the others in order to determine whether the defendant went farther than he was justified in doing."  *Brown v. United States*, 256 U.S. 335 (1921) (also commenting "it was possible for the jury to find that Brown … exceeded the limits of reasonable self defence [*sic*]….")

In this case, the state court held that a rational trier of fact could have found that Petitioner used more force than was reasonable to defend against the threat Misaalefua posed, in part because Petitioner could have defended against the threat by keeping the door between the laundry room and garage closed.  The appellate court's holding is not unreasonable or contrary to *Beard* and *Brown*.

**b.   Appellate Court Opinion Not Unreasonable Determination of the Facts**

Petitioner argues that the state court opinion is based on an unreasonable determination of the facts.  To prevail on this ground, Petitioner would have to demonstrate that the factual findings upon which the state court's determination rests are objectively unreasonable.  *Miller-El*, 537 U.S. at 340.  As Petitioner points out, the

appellate court's analysis includes the statement that "[t]he jury could have reasonably inferred that Misaalefua was not attempting to enter Pulley's *home*,...."  (ECF No. 11-22 (Lodg. 5) at 16 (emphasis added)).  The statement suggests—despite all the evidence that Misaalefua was *inside* Petitioner's attached garage—that Misaalefua was *outside* of Petitioner's home at the time of the killing.  This led Petitioner to conclude that the jury and appellate court incorrectly determined that the killing occurred outside of his home and that Petitioner was not entitled to the presumption set forth in § 198.5 on that incorrect basis.

It is immaterial whether this statement and its implication that the killing happened outside the home were inaccurate, because the state court did not rely on the objectionable suggestion—that the killing happened outside the home—in its decision.  Instead, as the Petition concedes (ECF No. 1 at 39), the appellate court's decision rests on the determination that even though Petitioner was protecting himself from an intruder in his home, he used more force than was reasonable.  (ECF No. 11-22 (Lodg. 5) at 16-17).

Specifically, the appellate court found that the jury could have found Petitioner met his evidentiary burden to raise the presumption that he was protecting himself against an intruder in his home, but that the jury nevertheless found the killing was not legally justified because Petitioner used more force than was reasonable to defend against the danger.  (ECF No. 11-22 (Lodg. 5) at 16 ("The jury could have concluded that in retrieving a gun and shooting an unarmed man, Pulley used more force than was reasonably necessary to protect himself or his

30

1   house, and thus, that the presumption of justification embodied in

2   section 198.5 had been overcome by contrary evidence.")).   Petitioner

3   contends that the appellate court opinion "points to no facts in support

4   of this possibility, nor does it explain how petitioner could have

5   protected himself or his home and family with less force."  (ECF No. 1 at

6   39).   To the contrary, the appellate court explained that Petitioner used

7   more force than necessary by "bringing a gun to what was, essentially, a

8   fistfight," and then shot "an unarmed man."  The appellate court

9   further suggested that "Pulley could have avoided the entire incident if

10  he had simply remained inside his house," and noted that Petitioner

11  could have "lock[ed] the [laundry] door or call[ed] the police."  (ECF No.

12  11-22 (Lodg. 5) at 16).   The appellate court's conclusion is based on a

13  reasonable determination of the facts, and does not rely on the

14  statement and inference Petitioner finds objectionable.

15      The state court's decision finding sufficient evidence to affirm the

16  murder conviction was not objectively unreasonable.  *See Yarborough*,

17  540 U.S. at 4; *Medina*, 386 F.3d at 877.   The state court's adjudication

18  did not result in a decision contrary to federal law, was not an

19  unreasonable application of federal law, and was not based on an

20  unreasonable determination of the facts presented at the state

21  proceeding.  *See* 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. at 8.

22  Accordingly, the Court **RECOMMENDS** claim one (1) be **DENIED**.

23      **B.  Claim 2: Insufficient Evidence of Malice**

24      Petitioner argues that, given the facts in this case, it was

25  impossible for the prosecution to prove and the jury to find beyond a

31

14-cv-2034-JLS-MDD

reasonable doubt that Petitioner did not act under a sudden quarrel or heat of passion when he shot Misaalefua.  (ECF No. 1 at 44).  He contends there is insufficient evidence of malice aforethought because the undisputed evidence shows that Petitioner "was pursued into his own home by someone who wanted to cause him physical harm and who was drunk and could not be reasoned with by his own family." (*Id.*).  He further argues that there is insufficient evidence that Petitioner acted with malice because he lacked capacity to form malice due to his intoxication.  (*Id.*).

### 1. State Court Opinion

Petitioner also presented this claim in his habeas petition to the state appellate and supreme courts on direct review.  (ECF Nos. 11-20, 11-23 (Lodg. Nos. 3, 6)).  The appellate court denied Petitioner's claim on the merits.  (ECF No. 11-22 (Lodg. No. 5)).  The California Court of Appeal rejected Petitioner's contention that there is insufficient evidence for the jury to have determined that Petitioner acted with malice aforethought.  (ECF No. 11-22 (Lodg. No. 5) at 17-21).  The California Supreme Court summarily denied the petition without a statement of reasoning or citation to authority.  (ECF No. 11-24 (Lodg. No. 7)).  Accordingly, this Court must again "look through" to the state appellate court's opinion denying the claim.  *Ylst*, 501 U.S. at 805-806.  That court wrote:

> Pulley argues that even if this court disagrees that the only reasonable conclusion from the evidence is that he acted with legal justification, this court should nevertheless reduce his conviction to voluntary

14-cv-2034-JLS-MDD

manslaughter on the ground that the evidence demonstrates, at most, that he acted pursuant to the heat of passion, and that there is thus insufficient evidence that he acted with the requisite malice required for second degree murder.  We reject this argument, as well.

We apply the same standards for reviewing a claim of insufficiency of the evidence that we set out in part III.A., *ante*, in considering Pulley's related sufficiency claim.

Murder is the unlawful killing of a human being "with malice aforethought." (§187, subd. (a).)  Pulley was convicted of second degree murder, which is the "unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder." (*People v. Knoller* (2007) 41 Cal.4th 139, 151 (*Knoller*).)  Malice may be either express (as when a defendant manifests a deliberate intention to take away another person's life) or implied.  (*People v. Blakely* (2000) 23 Cal.4th 82, 87.)  "Malice is implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' [Citation.]  In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another…."  (*Knoller, supra*, at p. 143.)

Malice may be, and often must be, proved by circumstantial evidence.  (*See People v. Lashley* (1991) 1 Cal.App.4th 938, 945-946; *People v. James* (1998) 62 Cal.App.4th 244, 277.)  "One who intentionally attempts

33

to kill another does not often declare his state of mind either before, at, or after the moment he shoots. Absent such direct evidence, the intent obviously must be derived from all the circumstances of the attempt, including the putative killer's actions and words. Whether a defendant possessed the requisite intent to kill is, of course, a question for the trier of fact." (*People v. Lashley, supra*, at pp. 945-946.)

Pulley contends that the evidence showed that he acted not with express or implied malice, but instead, pursuant to the heat of passion, such that the element of malice was negated. He argues that the prosecution failed to prove malice aforethought because it failed to prove the absence of provocation and heat of passion beyond a reasonable doubt. Pulley maintains that we should find that provocation and heat of passion existed as a matter of law, and reduce the offense to voluntary manslaughter. We reject Pulley's contentions.

"Where an intentional and unlawful killing occurs 'upon a sudden quarrel or heat of passion' (§ 192, subd. (a)), the malice aforethought required for murder is negated, and the offense is reduced to voluntary manslaughter—a lesser included offense of murder." (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306.) Heat of passion has both objective and subjective components. (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*).) To satisfy the objective component, the claimed provocation must be sufficient to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection, from passion rather than from judgment. (*Id.* at p. 550.) "The provocation… must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim." (*Id.* at pp. 549-550.) A defendant may not " ' "set up his own standard of

34

14-cv-2034-JLS-MDD

conduct and justify or excuse himself because in fact his passions were aroused....” ’ ” (*People v. Cole* (2004) 33 Cal.4th 1158, 1215-1216, quoting *People v. Steele* (2002) 27 Cal.4th 1230, 1252.)  “To satisfy the subjective element of this form of voluntary manslaughter, the accused must be shown to have killed while under ‘the actual influence of a strong passion’ induced by such provocation.” (*Moye, supra*, at p. 550.)

Pulley correctly points out that when murder and voluntary manslaughter are under consideration, the burden is on the prosecution to prove, beyond a reasonable doubt, the absence of a sudden quarrel or heat of passion, in order to establish the malice element of murder.  (*People v. Rios* (2000) 23 Cal.4th 450, 454.) However, “[e]ven if defendant’s testimony provided some evidence of provocation for the jury to consider, it remains the jury’s exclusive province to decide whether the particular facts and circumstances are sufficient to create a reasonable doubt as to whether the defendant acted under a heat of passion. [Citations.]” (*People v. Bloyd* (1987) 43 Cal.3d 333, 350.)  “ ‘The jury [is] not required to accept the defendant’s version of the killing. [Citations.]’ [Citation.]” (*People v. Harris* (1971) 20 Cal.App.3d 534, 537.)  Here, the trial court properly instructed the jury as to both murder and voluntary manslaughter and we " 'credit jurors with intelligence and common sense’ [citation] and presume they generally understand and follow instructions [citation].” (*People v. McKinnon, supra*, 52 Cal.4th at p. 670.)

The question before this court is whether, examining the entire record in the light most favorable to the judgment, a reasonable jury could have found that Pulley harbored the malice necessary to support a second degree murder conviction.  We conclude that there was ample circumstantial evidence of an intent to

14-cv-2034-JLS-MDD

kill (express malice), as well as evidence of an awareness of the risk to life and action in conscious disregard for life (implied malice).

The evidence showed that after having engaged in an altercation with Misaalefua, Pulley walked back to his house, saying, "I got something for you."  He went into his house and retrieved a loaded gun.  Pulley took off the safety of the gun, which required a very deliberate action, and walked back out to where Misaalefua was waiting.  Pulley then shot at Misaalefua at close range, twice. [n.3 One of the gunshots entered Misaalefua's chest from a distance of less than six inches.]  He had to apply six pounds of pressure to pull the trigger each time.  Shooting at a person from very close range is a strong indicator of an intent to kill.  (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690; see also *People v. Lashley, supra*, 1 Cal.App.4th at p.945 ["The very act of firing a .22-caliber rifle toward the victim at a range and in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill."  Shooting at point blank range "undoubtedly creates a strong inference that the killing was intentional"].)  Beyond this, there was evidence that Pulley was clearly aware of the dangerousness of bringing a loaded gun outside during an altercation, and taking the safety off, such that the jury could have inferred that Pulley acted with conscious disregard for life.

Even if Pulley was upset due to the altercation with Misaalefua, the evidence demonstrated that Pulley had separated himself from Misaalefua and that he had time to cool off and rationally consider his actions.  Instead of remaining inside his house, or even reengaging in an unarmed physical confrontation with Misaalefua, Pulley purposefully retrieved a gun, walked back out to his

36

14-cv-2034-JLS-MDD

1
2
3
4
5
6
7
8
9

garage, and shot his neighbor at close range.  Although the initial altercation had come to an end, Pulley clearly decided not only to continue it, but to escalate it.  From this evidence the jury could have reasonably concluded that Pulley intended to kill Misaalefua, and that he was not sufficiently provoked or acting under the heat of passion when he shot at Misaalefua, so as to reduce the crime from murder to manslaughter.  Pulley in effect is asking this court to reweigh the evidence and to reach a result different from the result that the jury reached.  However, that is not our role in examining the sufficiency of the evidence to support a conviction.

10

(ECF No. 11-22 (Lodg. 5) at 17-21).

11
12
13
14
15
16
17
18
19
20
21
22
23
24

## 2. Summary of Arguments

Petitioner contends that there was insufficient evidence of "malice aforethought" to support the second degree murder conviction.  (ECF No. 1 at 41-44).  He argues that he was provoked by Misaalefua into a sudden quarrel and shot Misaalefua in the heat of passion.  (*Id*.).  Petitioner further argues that he lacked the capacity to form malice because he was intoxicated.  (*Id*. at 44).  Petitioner concludes that his murder conviction should be reduced to manslaughter because there is insufficient evidence of malice.  (*Id*. at 41-44).

Respondents' analysis is once again threadbare, and of little use to the Court.  Respondents argue that the state appellate court reviewed the evidence applying the *Jackson* standard, found the evidence sufficient to support the conviction and found the conviction was not contrary to or an unreasonable application of Supreme Court authority,

25

14-cv-2034-JLS-MDD

1    and was not based on an unreasonable determination of the facts.  (ECF
2    No. 10-2 at 14-17).

### 3.  Legal Standard

4        Under California law, malice may be either express or implied.
5    *People* v. *Blakely,* 23 Cal. 4th 82, 87 (2000).  "Malice is implied when the
6    killing is proximately caused by an act, the natural consequences of
7    which are dangerous to life, which act was deliberately performed by a
8    person who knows that his conduct endangers the life of another and
9    who acts with conscious disregard for life.  In short, implied malice
10   requires a defendant's awareness of engaging in conduct that endangers
11   the life of another ...."  *People* v. *Knoller,* 41 Cal. 4th 139, 143 (2007)
12   (citation omitted).  Malice may be, and often must be, proven by
13   circumstantial evidence.  *See People* v. *Lashley,* 1 Cal. App. 4th 938,
14   945-946 (1991); *People* v. *James,* 62 Cal. App. 4th 244, 277 (1998).

15       A defendant who commits an intentional and unlawful killing but
16   who lacks malice is guilty of the lesser included offense of voluntary
17   manslaughter.  Cal. Penal Code § 192.  "But a defendant who
18   intentionally and unlawfully kills lacks malice only in limited, explicitly
19   defined circumstances: either when the defendant acts in a 'sudden
20   quarrel or heat of passion'…, or when the defendant kills in
21   'unreasonable self-defense'—the unreasonable but good faith belief in
22   having to act in self-defense…."  *People v. Barton*, 12 Cal. 4th 186, 199
23   (1995) (citations omitted).

24       The sufficiency of the evidence standard the Court applied in
25   analyzing the first issue also applies here.  The question is "whether,

38

after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *see Johnson*, 406 U.S. at 362.

### 4. Analysis

Viewing the evidence in the light most favorable to the prosecution shows a rational trier of fact could have found the evidence against Petitioner was sufficient to support the finding of malice aforethought. As with the first issue, Petitioner's arguments rely on the facts as he interprets them, rather than presuming the jury resolved conflicting inferences in favor of the prosecution.

This Court cannot substitute the jury's decision with Petitioner's preferred resolution of conflicting inferences. This Court, like the state court, is charged with applying a deferential standard that presumes the jury resolved conflicting inferences in favor of the prosecution. *Jackson*, 443 U.S. at 326. Applying *Jackson*, this Court finds no constitutional error in the appellate court's conclusion that there was "ample circumstantial evidence of an intent to kill (express malice), as well as evidence of an awareness of the risk to life and action in conscious disregard for life (implied malice)." (ECF No. 11-22 (Lodg. 5) at 20).

The facts viewed in the light most favorable to the prosecution show that, although Petitioner was intoxicated and provoked into a sudden quarrel, he had the time and capacity to remove himself from the quarrel by walking into his home and closing the laundry room door

39

behind him.  At that point, he had the time to cool off and rationally consider his actions.  Petitioner acknowledges that the jury instruction for the heat-of-passion defense properly includes the explanation that "[i]f enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this bases [*sic*]."  (ECF No. 1 at 35 (citing CALCRIM 570)).   Petitioner, well-trained in gun safety, retrieved the gun, took off the safety, and returned to the garage where he knew Misaalefua was waiting, after Petitioner had goaded Misaalefua to follow him home by saying "I got something for you, motherfucker."  Although Petitioner contends Misaalefua tackled him and the shots went off in the struggle, the evidence viewed in the light most favorable to the prosecution shows that Petitioner shot Misaalefua at close range before Misaalefua began to struggle with Petitioner for the gun.

A jury rationally could find sufficient circumstantial evidence of express malice from Petitioner's provocative invitation to Misaalefua that he had something for him, and from his actions of retrieving the gun, removing the safety, and pulling the trigger with six pounds of pressure twice.  Also, a jury could rationally find sufficient circumstantial evidence of implied malice—a conscious disregard for life—from Petitioner's decision to return to confront Misaalefua despite time and space to cool off and despite his extensive training in gun safety, and from his decision to bring a loaded gun with the safety off when he returned to face Misaalefua.

40

A rational jury also could have found that Petitioner's intoxication did not render him incapable of harboring malice.  Though the state court did not address this point explicitly, it noted that there is no dispute that the jury was properly instructed and that the appellate court presumes that the jury follows instructions absent evidence to the contrary.  Indeed, there is no dispute that the jury was properly instructed on the voluntary intoxication defense to the element of malice.  (ECF No. 1 at 37 n.4).  The evidence in the light most favorable to the prosecution shows that Petitioner did not protect himself with a gun during the quarrel with his son earlier that evening, or during the quarrel with the firefighters that ended less than 13 minutes before Petitioner shot Misaalefua.  There is no evidence in the record that Petitioner consumed more alcohol or that his intoxication increased between the quarrel with the firemen and the shooting.  Petitioner's ability to refrain from shooting a gun in the earlier quarrels—one within minutes of the shooting—is sufficient evidence to support the jury's decision to reject intoxication as a bar to a finding of malice.

The appellate court's decision refusing to reweigh the evidence that can be rationally interpreted to affirm the conviction was neither unreasonable nor contrary to clearly established federal law, and was not based on an unreasonable determination of the facts.  Accordingly, this Court **RECOMMENDS** claim (2) be **DENIED**.

## VI.  CONCLUSION

For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the District Court issue an Order: (1) Approving and Adopting this Report

14-cv-2034-JLS-MDD

and Recommendation; and, (2) **DENYING** Petitioner's Petition for Writ of Habeas Corpus in its entirety.

**IT IS HEREBY ORDERED** that any written objections to this Report must be filed with the Court and served on all parties no later than **December 24, 2015**.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objection shall be filed with the Court and served on all parties no later than **January 6, 2016**.  The parties are advised that the failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998).

**IT IS SO ORDERED.**

Date:   December 3, 2015

Hon. Mitchell D. Dembin
United States Magistrate Judge

14-cv-2034-JLS-MDD